**Commonwealth v. Brown**

*Ted Fagan, Assistant District Attorney,* for Commonwealth.

*H. David Rothman,* for defendant.

CLARKE, *J.*, November 2, 1977 — In an opinion of the Pennsylvania Supreme Court (Roberts, *J.*) filed July 8, 1977, judgment of sentence for second degree murder in the above case was reversed and a new trial awarded. The new trial is scheduled to take place November 14, 1977. Meantime, defendant has applied to this court "to suppress all statements including courtroom testimony and evidence gained thereby."

In the Supreme Court's opinion it is set forth that:

"On Saturday, October 13, 1973, the victim was stabbed to death while working after hours in an office on the twenty-third floor of the Koppers Building, a downtown Pittsburgh office building. Her body was discovered at about 2:00 a.m., the next morning.

"On Sunday, October 14, the Pittsburgh Police Department interviewed individuals who had been in the building the night before. Two detectives went to the home of appellant, a security guard who had been on duty in the Koppers Building the night of the killing. They arrived at appellant's home at 11:00 a.m. They requested appellant to accompany them to the Public Safety Building for questioning. Appellant complied and was taken to the Public Safety Building.

"Appellant arrived at the Public Safety Building at noon. Appellant was taken to an interview room where he was left for approximately an hour. The room had no windows, and the door was left closed. The two detectives returned to the interview room at 1:00 p.m., Sunday. Appellant was not advised of his constitutional rights before questioning but was told he was not under arrest. The two detectives asked him about his work schedule at the Koppers Building the night before. The detective who testified at the suppression hearing could not re-

member if appellant was asked if he was involved in the killing.

"Appellant was questioned intermittently all afternoon. Other members of the Koppers Building staff were also questioned at the Public Safety Building Sunday afternoon.

"At approximately 9:00 p.m., appellant agreed to take a polygraph examination. The polygraph operator, who had been called in earlier that day, examined two individuals: appellant and James Robinson, a security guard who had been on duty with appellant the night of the killing. Appellant was given Miranda warnings. (See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), in connection with the polygraph examination.) The examination began with background questions, including questions relating to appellant's work schedule the night of the killing. Appellant was also asked if he had been on the twenty-third floor that night, and if he knew who might have committed the killing. Appellant was then asked ten specific questions relating to the crime.

"After the polygraph examination, appellant was asked to consent to the search of his home. He was informed orally of his right to refuse to consent to the search and signed a consent form. The consent form include[d] a statement that appellant understood he was not in custody.

"Appellant was then driven back to his home by the two detectives who picked him up that morning. They arrived at appellant's home at 10:30 p.m. After appellant gave the officers the clothes he had been wearing on the night of the killing, they drove him back to the Koppers Building, where appellant completed the balance of his 4:00 p.m. to midnight shift.

"The next afternoon, Monday October 15, appel-

lant attended a meeting of security guards called by Koppers Building officials. Police officers were present and took handwriting samples, hair samples, and photographs of the security personnel. Lieutenant James Pampena, who was in command of the police investigation, interviewed Robinson and appellant at the Koppers Building. After noting certain discrepancies between Robinson's and appellant's stories, Pampena requested that appellant accompany him and three other officers to the Public Safety Building to 'iron out' the discrepancies. Robinson was also taken to the Public Safety Building.

"They arrived at the Public Safety Building at approximately 5:15 p.m. Pampena first questioned Robinson for about five minutes, then began interrogation of appellant. During this session, appellant made statements which conflicted with statements he made earlier that afternoon. At 7:35 p.m., Pampena confronted appellant with these discrepancies and gave appellant Miranda warnings. Appellant subsequently admitted he killed the victim. He agreed to have his statement recorded on tape and, after being given a second set of Miranda Warnings, repeated his admission on tape. Appellant was arraigned at about 10:00 p.m., Monday, October 15."

In the Supreme Court opinion, there was discussion about statements made by defendant on both Sunday and Monday, October 14 and 15, 1973. At first reading, the opinion is not all that clear on the issue, but this court has finally concluded that the effect of the Supreme Court opinion is to suppress *only* "The oral admissions and the subsequent taped statement obtained later that [Monday] eve-

ning" and *not* any admissions or statements obtained or made at the Public Safety Building, or elsewhere, on Sunday, October 14, 1973.

This ruling is, of course, binding on this court for purposes of the new trial, and none of defendant's admissions or statements of October 15, 1973, may be used by the Commonwealth at the new trial. This court construes the Supreme Court opinion to apply only to those statements or admissions then, and not to any which may have been made on any date *prior* to October 15, 1973, since such would have been litigated once already before the first trial court and also would have been before the Supreme Court for its consideration, and, therefore, defendant would not be entitled to *re*litigate the issue of pre-October 15 statements before this court.

This court construes the opinion of the Supreme Court differently, however, with regard to any statements or admissions made afterward or *post*-October 15, 1973. Such were not litigated before the first trial court nor apparently considered or dealt with by the Supreme Court, and, therefore, are properly before this court for consideration and disposition.

Chief among these subsequent utterances presently known to this court are defendant's testimony when he took the stand as a witness in his own behalf at his first trial; a television interview or program on which it is alleged he appeared and also an alleged communication with a counselor at the State Correctional Institution at Pittsburgh, the latter two taking place during his incarceration subsequent to trial and pending appeal and retrial.

This court is of the opinion that it will need addi-

tional information concerning the circumstances of the television statement and the admission to the counselor in order to make a determination of their availability to the Commonwealth as evidence at a new trial and in an order dated November 1, 1977, time has been set aside for that purpose by the court in a hearing scheduled for November 7, 1977.

As to the utterances of defendant as a witness at his first trial, however, this court is of the opinion it has enough information to make a disposition of defendant's application to suppress, and it is the opinion of the court that defendant's application in this regard must be denied. An appropriate order will be prepared in a separate instrument.

## II

The substance of defendant's argument in support of his application to suppress his court testimony at the first trial is that it was not voluntarily given by him, but rather "was compelled by and was the product of the statements which the Supreme Court has concluded were unlawfully obtained. His testimony in Court . . . was upon the advice of counsel . . ." and was also the product of an arrest "without a warrant and without probable cause." As to the latter reason, this court is of the opinion that the "arrest/incident" reason in support of defendant's suppression application is without merit. If it was not raised and disposed of prior to this, it is too late to do so now and, furthermore, in this court's opinion there was ample probable cause for the felony arrest.

As to the issue of compulsion of defendant's testimony at the first trial, defense counsel calls this court's attention to page 345 of the first trial record where he is reported as saying at sidebar:

"In view of the admission of the defendant's con-

fession over objection, I feel compelled in my judgment as trial counsel to put the defendant on the witness stand because there are certain facts that are not explained in the confession, which are important to this case, and I simply am making a statement while he is taking the witness stand on my advice, it is not voluntary in the sense that if the confession had been suppressed, as I thought it should have been, he would not [have had] to take the stand to incriminate himself. And, I just want to make that statement on the record.

"MR. FAGAN: I don't think there is any necessity for that statement. It is his judgment as to how he should proceed in this case and to put on the record that he is being forced to put the defendant on the stand by reason of the fact that a confession was admitted and heard by the jury, I don't think that is any basis for him putting a statement like that on the record and I object to it.

"MR. ROTHMAN: Well, my feeling is, Your Honor, that the defendant's credibility for the confession requires support from the defendant and by the defendant's own credibility the jury has heard the tape, but I feel that they have to make their own assessment of Melvin Brown and I chose to put him on the stand. My thinking is simply this, Your Honor: it may be wrong in the final analysis, but ultimately if the Supreme Court opinion, if there were a conviction, was to reverse and say that the confession should not be admitted, I feel that his testimony now could be not used against him on a re-trial in view of the position that we are in and that is why I am making this statement.

"THE COURT: Well, that is something that could be decided in the future. If you want to put it on the record, go ahead. It really doesn't mean anything as far as I am concerned.

"MR. FAGAN: But, I certainly don't feel—

"THE COURT: He can put anything on the record.

"MR. FAGAN: The only thing I object to, sir, is him putting on the record now, 'I am doing this against my better judgment and only because I find myself in the manner or situation I do, I am forced to put the defendant on.'

"THE COURT: Now, wait a minute. He is a lawyer. He is hired to represent this defendant and give him advice, if he wants to, and I presume he is giving him the best advice he can. If you give him the wrong advice, that is his problem, and the defendant has to go with it.

"MR. FAGAN: All right, sir."

Defendant's position is that he was compelled by circumstances to testify, when otherwise he might not have had to and, therefore, it would be unfair to use this incriminating evidence against him. In support of this position, he cites the case of Harrison v. United States, 392 U.S. 219, 88 S. Ct. 2008, 20 L.Ed. 2d 1047 (1968). That is the case which on its publication inspired one writer to comment that the confession branch of the poisonous tree had grown a new variety of fruit. With three Justices dissenting, the court held that, unless the prosecution can prove that a defendant's inculpatory testimony at his prior trial was not induced by the admission of a confession later found to have been illegally obtained, his trial testimony cannot be used against him on re-trial.

If Melvin Douglas Brown's testimony is to be regarded as "fruit" of anything, as dissenting Mr. Justice White felt about Harrison's testimony in the cited case and may have said, although not in so many words, Brown's testimony fell too far from the poisonous tree to be tainted.

A 1968 Harvard Law Review article by Louis Henkin in Volume 82 at page 221, the Supreme Court, 1967 term, considers the evidentiary issue of the Harrison case in the following quoted paragraphs:

"Although when removed from its original fourth amendment setting the 'poisonous tree' doctrine would seem to support the Court's result, the majority's analysis in Harrison suffers from a failure to consider the differences between the interests protected by the fourth and fifth amendment exclusionary rules. As Mr. Justice White pointed out in his dissent, the policies furthered by exclusion determine the nature of the link between proffered evidence and constitutionally proscribed conduct necessary to exclude the evidence as a product of that violation. Under the fourth amendment, the evidence of the constitutional wrong lies in the initial invasion of person or property; the exclusionary rule, as originally conceived, was a means of deterring this invasion. It is for this reason that the attenuation limitation arose in the fourth amendment context. As the causal chain between a wrongful act by the police and subsequent evidence becomes more attenuated, it becomes less likely that an intent to secure the evidence motivated the police action or that its exclusion would deter similar actions in the future.

"On the other hand, the gravamen of a constitutional wrong under the fifth amendment is the use of a defendant's coerced testimony against him in a criminal proceeding, not the mere act of compelling him to speak; the fifth amendment exclusionary rule is an essential element of the constitutional right, not just a means of enforcing the right. Therefore, Mr. Justice White seems mistaken in requiring a showing that the exclusion of Harri-

son's testimony will deter the police from obtaining future confessions in impermissible circumstances. The crucial issue in the fifth amendment context of Harrison is, rather, whether there exists a chain of coercion running from the original compelled admissions to subsequent testimony by the defendant such that the admission of this testimony would violate the defendant's right against coerced self-incrimination."

Mr. Justice Stewart delivered the opinion for the majority in Harrison and in 392 U.S., at page 222, he said:

"In this case we need not and do not question the general evidentiary rule that a *defendant's testimony at a former trial is admissible in evidence against him in later proceedings*. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." (Emphasis supplied.)

In the next paragraph of the court's opinion, Mr. Justice Stewart invokes the "time-worn metaphor" of the fruit of the poisonous tree doctrine and takes it from its theretofore Fourth Amendment trunk. He cites the Silverthorn Lumber case and grafts it (to maintain the arboreal figure of speech) onto a Fifth Amendment branch.

Then, in the following paragraph the Supreme Court opinion notes that both the trial court and the circuit court in Harrison referred to the conscious tactical decision of defendant to seek acquittal by

taking the witness stand after his in-custody statements had been let in to evidence, and goes on to say, significantly, ". . . that observation is beside the point. The question is not *whether* the petitioner made a knowing decision to testify, but *why*." (Emphasis in original.)

This, then is the test, the standard by which the permissible use of former trial testimony must be judged, in the opinion of the United States Supreme Court, and which was so sharply perceived by the writer of the Harvard Law Review article mentioned supra. That author said, it is recalled that the crucial issue in the fifth amendment context of Harrison is to determine if there is a "chain of coercion" connecting the in-court testimony to the original unlawfully obtained confession—the "why" test of Mr. Justice Stewart.

In Harrison, the Supreme Court, at page 225, said: ". . . but for the use of his confessions, the petitioner might not have testified at all" at his first trial, and then held that the government had not demonstrated that defendant's testimony was obtained by means sufficiently distinguishable from the underlying illegality to be purged of the primary taint.

The record in the Melvin Douglas Brown case demonstrates to the contrary, to this court, that Brown fails the "but for" test and that his clearly stated and inferential purpose in testifying *was* sufficiently distinguishable from any underlying illegality, and so, if it must be regarded as a fruit, it is one which fell so softly from the tree as to be unblemished and fit for consumption by the fact finder at Brown's retrial.

The "why" of Brown's taking the witness stand was clearly stated by defense counsel at argument

when he said that it was to permit the jury to see and hear him to further his insanity defense. As counsel relived through making the decision once again during recent argument, the tactic was professionally unassailable. For Brown to raise the defense of insanity and then to sit silently at counsel table and let his fate depend largely upon the testimony of a psychiatrist, an after-the-fact expert witness, would seem to be a poor trial tactic, in the sense that the word tactic is used as meaning a device for the purpose of accomplishing an end. And that end was to gain an acquittal at the hands of the jury on the grounds of insanity, or at least to reduce the offense to the least serious grade of homicide.

Admittedly, as the Harrison court said, at page 225, it may be difficult to unravel the many considerations that might have led defendant to take the witness stand at his first trial. Defense counsel's statement, on page 345 of the record of the first trial, is to the effect that he felt it essential for defendant to take the witness stand "because there are certain facts that are not explained in the confession which are important to this case," and later, on page 346, indicated that "the defendant's credibility for the confession requires support from the defendant . . . I feel [the jury] have to make their own assessment of Melvin Brown and I choose to put him on the stand."

Brown's appearance on the witness stand and his in-court testimony were *not* impelled or compelled by his prior (subsequently determined unlawfully obtained) confession but by his hope to convince the jury that he did not have the mental capacity to be criminally culpable for the murder of Mary Lee Walters.

## III

A somewhat analogous issue is presented when it is alleged that a coerced confession "induces" a guilty plea. Is the plea, no less than the self-incrimination privilege in Harrison, the "fruit" of prior illegality by the police, and thus vulnerable to collateral attack?

In this sort of a situation, Mr. Justice White, one of the three dissenters in Harrison, delivered the opinion of the United States Supreme Court, which, three years after Harrison in McMann v. Richardson, 397 U.S. 759, 770, 90 S. Ct. 1441, 25 L.Ed. 2d 763 (1970), viewed the problem differently:

"In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the grounds that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases . . . We hold, therefore, that a defendant who alleges that he pleaded guilty because of a prior coerced confession is not, without more, entitled to a hearing on his petition for habeas corpus."

## IV

There has been no Pennsylvania appellate court decision brought to this court's attention which might be regarded as a precedent for or against

defendant's contention that his in-court confession should be suppressed for the reason he assigns. There are Pennsylvania cases dealing with the propriety of admitting tainted confessions into evidence at a *first* trial. For example, the case of Commonwealth v. Hart, 471 Pa. 271, 274, 370 A. 2d 298 (1977), where defendant was convicted of third degree murder and the Pennsylvania Supreme Court said:

"Assuming that defendant's arrest was without probable cause [and his subsequent confession was tainted as 'fruit of the poisonous tree'], we are of the opinion that the error was harmless beyond a reasonable doubt. [Defendant] took the stand in his own defense and his trial testimony reiterated the facts of his confession. . . . 'This court has consistently held that when a defendant takes the stand and reiterates the factual narrative contained in a confession claimed to be invalid—whether for constitutional infirmities or because of violation of Rule 130 . . . the admission into evidence of the alleged illegal formal [sic] confession, if error at all, is harmless error beyond a reasonable doubt (citing cases)."

The Pennsylvania Supreme Court similarly sustained a conviction for first degree murder in Commonwealth v. Cummings, 466 Pa. 332, 353 A. 2d 381 (1976), using almost identical language as in Hart, supra. In Commonwealth v. Brittain, 455 Pa. 562, 317 A. 2d 219 (1974), the court had to deal with a constitutionally infirm *second* statement of defendant and affirmed defendant's voluntary manslaughter conviction saying, at page 568: "it must be concluded that the error of admitting her second statement was cured and its admission rendered harmless beyond a reasonable doubt."

The case of Commonwealth v. Saunders, 459 Pa. 677, 681, 331 A. 2d 193 (1975), is an interesting one. Defendant was convicted of second degree murder and on direct appeal challenged admissibility of an inculpatory statement she gave to police and which was introduced, over objection, at trial. The Supreme Court denied her appeal and affirmed the judgment of sentence of 10 to 20 years. At page 194, the court said:

"Carolyn Saunders herself took the stand at trial and gave almost verbatim the same version of the episode as that contained in the statement which was introduced into evidence. We have held a number of times that such corroborative testimony by a defendant disentitles him from claiming that an error in admitting a statement constitutes ground for reversal. (citing cases)"

The court's opinion on page 195 goes on to say:

"Appellant contends that she should not be foreclosed because had the statement been excluded, she would not have adopted the trial strategy that she did, namely, to admit the shooting as a scare device but to deny any intention to hit the decedent. . . . In the face of the Commonwealth's overwhelming evidence, appellant's 'most promising course' was that which she pursued. . . ."

The case of Commonwealth v. Henderson, 441 Pa. 255, 258, 272 A. 2d 182 (1971), contains a somewhat analogous issue, where in a post-conviction hearing application proceeding defendant asserted that at his trial he pleaded guilty generally to a murder indictment with the thought in mind that leniency would result. He received a life sentence. The Pennsylvania court said:

"A plea of guilty which would not have been en-

tered except for defendant's desire to avoid a possible death sentence does not necessarily demonstrate that the plea was not the product of a free and rational choice . . . Henderson decided to follow his counsel's advice and plead guilty. This, without more, demonstrates that the plea was not 'unlawfully induced.'"

## V

Brown's confession (out of court) was not the only evidence against him introduced in the Commonwealth's case. It should not be permissible for him now, second-guessing or with the benefit of hindsight, to negate the effect of his confession in court. He can't have it both ways.

## VI

The fact that the Commonwealth's application for reargument and/or clarification was denied by the Supreme Court cannot be held to be a pronouncement that the reasons assigned, waiver and harmless error, were without bearing on the issue. If that had been the court's opinion, it would have been simple enough for the court to say so. This court cannot speak for the Supreme Court and must take the denial to be simply a denial without reasons assigned.

## VII

The testimony of Melvin Brown as a witness on his own behalf at the first trial may be characterized as a confession made by him in open court. One may imagine the scene without having been there. The case had the usual dose of media publicity. The courtroom was crowded. The judge, the

jury, the lawyers, other witnesses, newspaper, radio and television reporters and all the dozens of spectators usually attracted to such a trial heard defendant recount his actions which the jury concluded were criminally responsible for the death of the young victim.

This court knows of no Pennsylvania or Federal authority which would justify it in ruling that the Commonwealth must pretend that such an event never occurred. The proposal that it must seems absurd on its face and absolutely contrary to law, common sense and public policy.